11SAUNDERS, Judge.
At trial, the workers’ compensation judge determined that Mr. Theriot’s benefits should be reinstated retroactively to the time of termination, but they should be reduced by 50% because Mr. Theriot had refused to cooperate with his employer’s efforts to rehabilitate him. On appeal, we find that the trial judge erred in reducing Mr. Theriot’s benefits, and we reverse.

FACTS

In January 1996, Bobby, Theriot began working for Church Point Wholesale Beverage Company (CPWB) at its facility in Opelousas, Louisiana. Mr. Theriot’s job responsibilities included selling beer to retail outlets, delivering beer to the stores, and loading and unloading various beer products. Mr. Theriot’s job regularly required him to load his truck with beer at the CPWB warehouse. Part of the loading onto the truck was done by forklift. Mr. Theriot testified that the employees would move beer pallets from the warehouse to the trucks using the forklift.
Mr. Theriot was injured on July 1, 1996. At the time of the accident, Mr. Theriot and other employees were taking beer from the warehouse and loading it onto trucks. The accident occurred when another employee of CPWB backed into Mr. Theriot with a forklift. The forklift struck *558 the right side of Mr. Theriot’s body, crushing his arm and his shoulder. As a result of the accident, the right side of Mr. Theri-ot’s body was bruised. More significantly, the accident caused a tear in the rotator cuff of his right shoulder. Mr. Theriot’s torn rotator cuff necessitated arthroscopic • surgery which Dr. F. Lionel Mayer performed. After the surgery, Mr. Theriot underwent six weeks of physical therapy; however, his right arm and shoulder never recovered from the accident. Mr. Theri-ot’s right arm is visibly atrophied compared to his left arm. Dr. Mayer indicated that Mr. Theriot should not return to the same type of work he was performing at the time of his accident because the job | ¡required excessive lifting requirements for the type of injury he sustained.
Sometime thereafter, CPWB hired Louise Coleman & Associates, Inc. (Louise Coleman) to provide Mr. Theriot with vocational rehabilitation. Louise Coleman initially sent Ms. Deborah Waterman, a rehabilitation nurse, to Opelousas to discuss Mr. Theriot’s rehabilitation. During this meeting, Ms. Waterman questioned Mr. Theriot about his former employment and his education. At the termination of that meeting, tyls. Waterman said that she would mail job information to him. Mr. Theriot testified that Ms. Waterman never conducted testing on him. Rather, Mr. Theriot testified that during their one meeting, he and Ms. Waterman “sat and we drank a cup of coffee at McDonald’s and we talked.” Mr. Theriot testified that Ms. Waterman did send him a “couple of job deals.” Mr. Theriot testified that he went to the Job Service office in Opelousas and met with Mr. Fontenot to discuss the three job listings that Ms. Waterman had sent him. Mr. Theriot testified that through this meeting, he learned that he could not perform two of the jobs Ms. Waterman had listed because they required lifting over fifty pounds. The other job listed had already been filled.
Ms. Anne Rearick became involved in Mr. Theriot’s vocational rehabilitation after Ms. Waterman terminated her employment with Louise Coleman. Ms. Rearick never met with Mr. Theriot. Contact between the two was limited to telephone calls and letters. Mr. Theriot received letters from Ms. Rearick on September 24, 1997, January 21, 1998, and February 11, 1998. In the January 21, 1998, letter Ms. Rearick indicated that there were nine job offerings available to Mr. Theriot. Ms. Rearick’s letter only provided a brief description of the nine positions and the pay range for each. Ms. Rearick’s letter did not provide the job identification numbers .used by the Job Service office to obtain specific information on those listings, or the names and addresses of the employers’ businesses. On January 26, 1998, Mr. Theriot called Ms. |3Rearick for more information regarding the jobs listed, specifically the location of the job openings she had indicated.
Mr. Theriot testified that he spoke to Ms. Rearick “two or three times at most” on the phone. Mr. Theriot’s phone bills indicate that he attempted phone contact with Ms. Rearick through her long distance number on numerous occasions. Mr. Theriot’s testimony further indicates that he had attempted to reach Ms. Rearick at her toll free number many times before resorting to calling her long distance line.
Like Mr. Theriot’s testimony, Ms. Rear-ick’s testimony indicates that they only spoke a few times on the telephone. Ms. Rearick first called Mr. Theriot on October 11, 1997. During their initial conversation Ms. Rearick testified that she “found Mr. Theriot to be very personable.” Ms. Rear-ick stated that during that conversation she learned that Mr. Theriot had registered with the Job Service office as requested by Ms. Waterman. In addition, Ms. Rearick learned that Mr. Theriot did not want to move out of St. Landry Parish, and he preferred to work in Opelousas. Finally, Ms. Rearick noted that Mr. Theri-ot stated “he was somewhat depressed due to his situation.”
*559 After that conversation, Ms. Rearick testified that she faxed perspective employers in Lafayette about job openings. She testified that she obtained newspapers from Lafayette and Opelousas and that she made several phone calls to inquire about job openings. Thereafter, Ms. Rearick testified that she sent a letter, dated January 21,1998, to Mr. Theriot listing nine job openings and requesting that he contact her for the phone numbers and addresses of the employers. These jobs were approved by Dr. Mayer on February 5, 1998.
Ms. Rearick testified that Mr. Theriot contacted her by phone on January 26, 1998. Ms. Rearick testified that during that conversation Mr. Theriot indicated that |4he “would not go out of St. Landry Parish.” She further testified that his reason for such response was that “his lawyer said so.” She also testified that Mr. Theri-ot indicated that he did not want information on the jobs she had sent him, but she could not recall why. However, Mr. Theri-ot testified that he had asked Ms. Rearick about the names of the jobs. He also testified that if she had given him the name of the jobs, he would have followed up on the jobs as he had done with the jobs listed by Ms. Waterman. Mr. Theriot further testified that he went to the Job Service office to see if he could locate the jobs Ms. Rearick had listed. Mr. Theriot testified that it was difficult to ascertain whether the jobs he identified with Mr. Fontenot were the jobs suggested by Ms. Waterman because she had not provided him with identification numbers. In addition, Mr. Theriot testified that if she had given him the names and addresses of the employers, he would have made direct contact with those employers.
Ms. Rearick testified that the next time she spoke to Mr. Theriot was on February 20, 1998. Ms. Rearick testified that she had called him again to offer information regarding the positions. Ms. Rearick testified that Mr. Theriot indicated that he had checked on the positions she had listed. She testified that he stated that he did not want information on jobs if they were not in St. Landry Parish. She also testified that he stated “he did not want to start a job and have the employer fire him because he [could not] do the job.”
Ms. Rearick testified that Mr. Theriot called her on March 23, 1998. During this conversation, Ms. Rearick testified that Mr. Theriot requested that she have the adjuster call him. She also indicated that Mr. Theriot had stated he had gone to the Job Service office to inquire about the initial list of jobs. However, Ms. Rearick indicated that he again expressed his resistance to leaving St. Landry Parish. Ms. Rearick testified that she did not have any other verbal contact with Mr. Theriot | ^thereafter.
Of the nine jobs Ms. Rearick listed for him, Ms. Rearick testified that she be-lievéd that he could perform all of them, save possibly the position of fry cook. Ms. Rearick testified that his ability to perform that job would depend on how heavy the pots were. The testimony of Ms. Fonte-not, a vocational rehabilitation counselor located in Ville Platte, Louisiana; however, conflicted with Ms. Rearick’s testimony regarding Mr. Theriot’s ability to perform the jobs listed. Ms. Fontenot testified that several of the nine jobs listed in Ms. Rearick’s letter to Mr. Theriot were medium strength jobs which Mr. Theriot would have been incapable of performing. On cross-examination, Ms. Rearick indicated that she had located some of the job listings given to Mr. Theriot as early as December 1, 1997, and January 5, 1998, but she did not check to see if those jobs were still available before she sent him the job listings.
Ms. Rearick admitted that she had not conducted any testing of Mr. Theriot. Ms. Rearick acknowledged that she had discretion in determining which clients to test. Furthermore, Ms. Rearick testified that such testing took about four hours. However, Ms. Rearick indicated that she had not tested Mr. Theriot because at that time her company did not have a rule *560 indicating that they must test all clients. At that time, she indicated that testing was performed on a client only if there was an indication of a cognitive deficit.
In addition to Ms. Waterman and Ms. Reariek, Mr. Theriot received assistance from Mr. John Fontenot with the Job Service office in Opelousas. Mr. Fontenot testified that Mr. Theriot first registered with his office on October 6, 1997. Mr. Fontenot testified that his office’s records indicated that Mr. Theriot made contact with the office on October 27, 1997, January 12, 1998, and March 2, 1998. Mr. Fontenot admitted that he “never [could] refer him to any jobs in which I could place | shim.”

PROCEDURAL FACTS

At the time of his injury, Mr. Theriot received an average weeMy wage of $318.55. The appropriate workers’ compensation rate was $212.38. After his surgery and subsequent medical treatment, Mr. Theriot was found to have reached maximum medical improvement and was released in September or October of 1997. CPWB terminated his weekly indemnity benefits on January 22, 1998. Mr. Theriot sued CPWB seeking various relief, including the reinstatement of his benefits.
After trial on the matter, the workers’ compensation judge (WCJ) issued his judgment. The WCJ found that CPBW provided insufficient vocational rehabilitation to Mr. Theriot for which he awarded a penalty of $2,000.00. The WCJ also found CPBW’s actions in terminating benefits without giving Mr. Theriot the opportunity to pursue the jobs indicated by his vocational rehabilitation counselors arbitrary and capricious. Therefore, the WCJ issued a $2000.00 penalty against CPWB. The WCJ reinstated Mr. Theriot’s benefits retroactive to the date of termination, but reduced his rate by 50% until Mr. Theriot actively participated in the vocational rehabilitation efforts. In addition, the WCJ ordered CPWB to provide Mr. Theriot with vocational testing and to perform a new labor market survey based on the results of that survey. The WCJ also ordered Mr. Theriot to cooperate with vocational rehabilitation efforts. Finally, the WCJ awarded Mr. Theriot $5,000.00 in attorney fees, and assessed all costs of the proceeding, including an expert witness fee of $500.00 for Ms. Fontenot’s testimony against CPWB.
From this judgment, Mr. Theriot appeals.

LAW AND ANALYSIS

STANDARD OF REVIEW
| yFactual findings in a workers’ compensation case are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep’t of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Stobart v. State, Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong. Id. Accordingly, if the WCJ’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).
REDUCTION OF BENEFITS
On appeal, Mr. Theriot asserts one assignment of error. Mr. Theriot argues that the trial court erred in reducing his benefits by 50% percent as allowed by La.R.S. 23:1226(E). In his reasons for judgment, the WCJ stated his reasons for reducing Mr. Theriot’s benefits as:
I do feel like that Mr. Theriot was at worse negligent, at best deliberate in his attempts to obstruct the vocational reha *561 bilitation efforts. Therefore, I’m instructing Mr. Theriot specifically to participate in the vocational rehabilitation efforts. And as something of an incentive to him, since I would ask or rule that his benefits from the date of termination to this date be reinstated and brought up to date retroactive, I would reduce that rate by fifty percent until he actually actively participates in the vocational rehabilitation efforts.
In other words, Mr. Theriot, to put it in plain English, you’re only going to get half of what you’re owed until you participate in voc rehab. I think that’s fair and there’s your motivation to do it. You’re entitled to your back benefits, no question, but they are going to be reduced by half until you participate and whether it’s Ms. Reariek or another voc rehab |scounselor that the employer chooses, whoever it happens to be, you need to participate, that’s part of the law, you have to do it.
La.R.S. 23:1226(E) provides, in pertinent part:
Refusal to accept rehabilitation as deemed necessary by the workers’ compensation judge shall result in a fifty percent reduction in weekly compensation, including supplemental earnings benefits pursuant to R.S. 23:1221(3), for each week of the period of refusal.
At issue in this case is whether Mr. Theri-ot refused to participate in his rehabilitation. CPWB argues that the WCJ’s determination that Mr. Theriot refused to accept rehabilitation efforts is supported by Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; City of Jennings v. Clay, 98-225 (La.App. 3 Cir. 10/14/98), 719 So.2d 1164; and Romero v. Grey Wolf Drilling, 594 So.2d 1008 (La.App. 3 Cir.1992).
All three of the cases cited by CPWB dealt with a complete refusal on the part of the claimant to accept rehabilitation. In Banks, the claimant refused all rehabilitation services on the advice of his counsel. Banks, 96-2840, 696 So.2d 551. The claimant in that case refused not only the rehabilitation services of his employer, but the rehabilitation services mandated by the hearing officer. Id. Therefore, the court reduced the claimant’s benefits by fifty percent for each week that he refused services until the claimant agreed to accept services. Id. Likewise, in City of Jennings, this court found that a reduction was warranted because the claimant, on the advice of his attorney, refused to schedule an initial vocational rehabilitation evaluation with the employer’s rehabilitation company. City of Jennings, 98-225, 719 So.2d 1164. Finally, in Romero, this court held that a reduction of benefits was proper because the claimant’s attorney “resisted every effort by [the rehabilitation consultant] to make an approach to rehabilitation. The attorney refused to let the | ¡^rehabilitation consultant] even interview his client-” Romero, 594 So.2d at 1018.
The instant case is clearly distinguishable from the cases discussed above. While Mr. Theriot has expressed his desire to remain living in his current home, Mr. Theriot has never refused to participate in the rehabilitation efforts of Louise ■ Coleman’s rehabilitation nurses. On the contrary, the testimony at trial shows that Mr. Theriot was willing to cooperate with the nurses and in some instances, take the initiative in the rehabilitation process. Mr. Theriot met with Ms. Waterman in Opel-ousas to discuss his rehabilitation. Later, when she sent him three job listings, he went to the Job Service office and followed • up on each listing with Mr. Fontenot. When Ms. Reariek took Ms. Waterman’s place, Mr. Theriot attempted to cooperate with her during her attempts to rehabilitate him. During their initial phone conversation, on October 11, 1997, Ms. Rear-iek testified that she “found Mr. Theriot to be very personable.” In addition, she testified that Mr. Theriot promptly responded to her letter of January 21, 1996, listing nine jobs by calling her office on January 26,1996. Despite her offer to give him the names and addresses of those employers, *562 Ms. Rearick did not do so. She did not give him that information during the conversation of January 26, 1996, nor did she send him another letter detailing the jobs she had listed earlier. Thereafter, Mr. Theriot took the January 21, 1996, letter to Mr. Fontenot with the Job Service office and attempted to locate the jobs listed.
In addition, as requested by Ms. Waterman, Mr. Theriot registered with the Job Service office in Opelousas. Mr. Theriot registered on October 6, 1997. After his initial registration, Mr. Theriot initiated contact with that office on October 27, 1997, January 12, 1998, and March 2, 1998.
Finally, the record shows that Mr. Ther-iot attempted to communicate with Ms. |inRearick. Mr. Theriot’s testimony and his phone bills indicate that he called Ms. Rearick on numerous occasions. Ms. Rearick’s testimony, in contrast, indicates that she can recall only two phone conversations she initiated. In addition, the evidence in the record shows that Ms. Rear-ick sent only three letters to Mr. Theriot.
The ultimate objective of rehabilitation is to place the claimant back into a competitive position in the labor market so his employment opportunities are reasonably maximized and the costs to the employer and to the workers’ compensation system are minimized. See Livings v. Langston Co., Incorporated/Continental Bag Div., 96-636 (La.App. 3 Cir. 12/5/96), 685 So.2d 405. Here, the achievement of this goal was thwarted not by Mr. Theri-ot’s refusal to participate in rehabilitation, but in Louise Coleman’s inadequate provi- - sion of rehabilitation services. Accordingly, we find that the WCJ erred when he reduced Mr. Theriot’s benefit rate by 50% percent. Therefore, we reverse the holding of the lower court.

DECREE

Based on the foregoing discussion, we-find that the WCJ erred in reducing Mr. Theriot’s benefit rate by fifty percent. We reverse the holding of the lower court, and order CPWB to pay his benefits in full retroactive to the date of termination. All costs are assessed to CPWB.
REVERSED.